[No. 1393.]

## Sandy Harrell *v.* The State.

Assault with Intent to Murder—Intent—Charge of the Court.— To authorize a conviction for assault with intent to murder, it must appear that the assault was committed with such intent. See the opinion, and the statement of the case, for evidence which called for a charge upon aggravated assault and battery.

Appeal from the District Court of San Jacinto. Tried below before the Hon. E. Hobby.

The indictment charged the appellant with an assault with intent to murder his wife, Laura Harrell. He was convicted, and was awarded a term of five years in the penitentiary as punishment.

Laura Harrell, the wife of the defendant, testified, for the

State, that one night during the month of June, 1882, while she was in bed, the defendant came home, and she asked him why he had not brought something for her and her child to eat. She complained to him that he had repeatedly promised to bring provisions home, but had failed, and that more than a week had elapsed since he had furnished the household with any food at all, during which time she was compelled to go out and provide food for herself and child. The witness was in bed, and the defendant was standing in the middle of the floor during this conversation. He replied to the witness that he was tired of hearing about something to eat, and that if the witness did not quit talking about it he would kill her. A few more words of the same purport passed between the parties, when the defendant jumped into the bed, and on the witness, and beat her savagely with his fists over the body and breast. As the witness struggled to the floor, the defendant caught up a chair, and beat her with it twice over the head, using abusive language, and saying, among other things, "I am going to kill you." The two blows struck on the head were very severe, and cut the scalp to the bone. The witness ran out of the house, shouting for "Aunt Barbara" and other neighbors. As she passed out, the defendant slammed the door behind her. Presently the witness returned to her room to get her child, when the defendant again assaulted her, striking her over the head three more times with the chair.

The witness then escaped the defendant, and, covered with blood and suffering greatly from her head wounds, ran over to "Aunt Barbara's" house and told her what had happened. The witness was laid up in bed over a month, under the treatment of a doctor, and narrowly escaped death. The chair used in the assault was a very heavy one.

On her cross-examination, the witness said that there was a bag of greens in the house at the time of the assault, but that it belonged to her step-father, who left it there for safe keeping over night. She denied that the defendant began quarreling with her on the night in question on a charge of being too intimate with other men. He made no such charge that night. He had so charged her previously, but wrongfully. She denied that she told the defendant, on that night, that she would do as she pleased, unless he did better by her; nor did she say to him that if he did not provide for her she would provide for herself. The defendant had never given her orders not to admit her step-father into the house. She did not tell Aunt Barbara that night

that she had struck her head against a lightwood knot, or a root or stump, which caused the flow of blood. The defendant endeavored to get the witness to give such an explanation of her wounds. She was laid up next day, and did not go to town, or to Mr. Byrd's. Immediately after the beating on the night in question, she went to Mr. Poe's. She did not know how long it was after she was beaten before she went to a spring to wash clothes. She did go to that spring before her recovery to wash some clothes for her child, and that adventure produced a relapse, which brought her to bed again. Doctors Johnson and Carlisle attended the witness.

Captain Poe testified, for the State, that he lived within a quarter of a mile of the house of the defendant, in San Jacinto county, in June, 1882. The witness Laura Harrell came to his house during that month, covered with blood. She complained to the witness that her husband had beaten her with a chair. The witness did not examine her wounds.

Doctor Johnson testified, for the State, that he was called as a physician to treat the witness Laura Harrell on the day after she received her injuries. He found her head very much swollen from the effects of two severe and dangerous wounds, which appeared to have been inflicted by some sharp-edged wooden instrument, after the order of a square bludgeon. One of these cuts was at the side of and about the middle of the head, and near the top. It was about one and a half inches in length, and nearly the same in depth. It was cut to the bone. The other cut was behind the first, and extended to the bone. The witness considered the wounds very dangerous at the time, and frequently during his treatment of the patient thought that she would die. She was confined to her bed by the wounds for a long time.

Doctor Carlisle, who treated the case in conjunction with Doctor Johnson, testified very much as did Doctor Johnson. For a time the witness thought that the woman would certainly die.

Pleas. Carnes, deputy sheriff for San Jacinto county, testified, for the State, that he went to the defendant's house on the morning after the assault, and took possession of the chair with which the assault was alleged to have been committed. It was a home-made child's chair, very heavy and much stronger than ordinary chairs. It was capable of inflicting death or great bodily injury if used in striking a person on the head. The legs

or posts were about one and a half inches thick, square and sharp-edged. It was bloody when the witness took charge of it.

D. L. Jagers, qualifying himself, testified, for the defense, that the reputation of Laura Harrell for truth and veracity was bad, and that he would not believe her on oath in regard to a matter involving her interests. He saw the scars on her head, which were said to have been caused by blows administered by her husband.

The motion for new trial assailed the rulings of the court on the evidence, the charge of the court, and the sufficiency of the evidence to sustain the verdict.

No brief for the appellant has reached the Reporters.

*O. S. Eaton*, for the State.

WHITE, P. J.   We are of opinion that the court should have charged the jury upon the law of aggravated assault and battery, under the facts and circumstances of this case as shown by the record. Whilst the evidence discloses a most wanton, outrageous and brutal assault, and one in which most serious and grievous injuries were inflicted by appellant upon his wife, still, if an opportunity had been afforded them the jury might have found the crime committed to have been aggravated assault had they concluded from the evidence that he could have taken her life, had he desired to do so, and yet did not do it, though he had the opportunity and no one was there to prevent it.

To justify a conviction for assault with intent to murder, it must be shown that that was the object and intent of the assault. An intent to inflict serious bodily injury and the infliction of serious bodily injury, without such intent, is not sufficient. (See *White* v. *The State*, decided at the late Tyler term, *ante*, p. 259.) Whilst it is true that if an assault be committed with intent to inflict serious bodily injury, from which death might likely ensue, and death does ensue, the offense would be murder; still, where such was the intent and death does not ensue, the assault cannot be said to be an assault with intent to murder. In other words, the intent to murder is the gist of this offense, and no intent short of that will sustain a conviction for assault with intent to murder.

As far as the charge went, it presented the law; but we think defendant was entitled to have the law of aggravated assault submitted, in addition to the law as charged.

Because the charge of the court did not sufficiently present the law applicable to the facts in the case, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered January 27, 1883.